Carl L. McKINNON et al., Appellants,

v.

Loyce J. LANE et al., Appellees.

No. 15665.

Court of Civil Appeals of Texas.

Fort Worth.

Dec. 9, 1955.

Rehearing Denied Jan. 6, 1956.

Rogers & Eggers and Guy Rogers, Wichita Falls, for appellants.

John Murphree, Iowa Park, and Arch Dawson, Wichita Falls, for appellees.

BOYD, Justice.

Prior to January 1, 1944, the United States (hereinafter called the Government) became the owner of 1,902.613 acres of land in Wichita County and subdivided it into farm tracts with numbered Units for sale to farmers as a rural settlement project. Appellee Loyce J. Lane purchased Unit 62, containing 47.436 acres, and the North 18.182 acres of Unit 63. Several other

tracts out of the original tract were sold by the Government, aggregating, with Lane's tract, 337.588 acres. In all such deeds the Government reserved ¾ of the minerals. After these sales were made and effective on June 1, 1949, the Government executed an oil and gas lease to Gordon T. West covering its ¾ interest in the entire 1,902.613 acres. On August 11, 1949, those who had acquired the 337.588 acres joined in executing a lease to West covering their combined tracts. In 1951 Congress authorized the sale by the Government of its ¾ of the minerals, giving the surface owners preference, and Lane and his wife, Wilma G. Lane, as well as all the other Unit owners, by independent purchases at different times, bought from the Government its ¾ of the minerals under the individual tracts, subject to the lease from the Government to West.

Loyce J. Lane filed this suit against Carl L. McKinnon, Carl L. McKinnon, Jr., Floyd Kirk, Ky T. Hunter, Tollie E. Underwood, F. C. Baldwin, L. A. Wood, and Benjamin D. Steed, the other Unit owners, praying for a determination that the royalty under the Government lease is owned by the parties on whose land the wells may be located.

The other Unit owners filed a general denial and Joe L. Hale and The West Company, assignees of Gordon T. West, intervened. The defendants and intervenors filed a cross-action against Lane and his wife, asking that the court decree that the royalties payable under both leases are pooled and payable to the parties in proportion to the acreage owned by each; that if from the record evidence the royalty interests are not now pooled, the leases be reformed so that all parties may participate in the royalties in proportion to the acreage owned. by each; that it be decreed that the intervenors have the right to produce such leases in any manner they may desire agreeably with other reasonable development, without regard to any line or portion of the 337.588 acre tract, and to run the oil into a common battery or batteries of tanks as may. be most economical, without obligation to drill offset wells;

and that it be decreed that the lease of August 11, 1949, contains covenants of warranty and that any title thereafter acquired by any warrantor passed under and was made subject to such lease and cannot be set up adverse to the title against which the lessors warranted.

A jury was waived and the court found and held that the royalty under the ¾ Government lease was not apportioned as between the individual tracts, and that the after-acquired title rule was not applicable in favor of the lessee under the oil and gas leases; that the royalties under the lease executed by the Unit owners are pooled; that intervenors have the right to drill wherever they may elect on the 337.588 acres, subject to valid regulations, without regard to interior lines and without obligation to drill offset wells; but the court declined to declare that the intervenors might commingle oil from the 337.588 acres in a common battery or batteries of tanks when in their opinion it would be economical to do so, holding that there was then no such controversy.

The Unit owners, other than the Lanes, and the intervenors have appealed. Appellants assign as error the holding that the ¾ royalty under the Government lease is not apportioned; the holding that the after-acquired title rule is not applicable in favor of the lessee; and the court's declination to declare that intervenors might commingle the oil.

It is conceded that there was an apportionment of the royalty under the lease from the Unit owners to West. The principal controversy is whether the ¾ royalty under the Government lease is apportioned among the Unit owners pro rata on an acreage basis or whether such royalty belongs to the owners of the tracts on which the wells may be located.

The Government lease provided:

"Sec. 2. * * * (b) Cooperative or unit plan. Within 30 days of demand, or if the land is within an approved unit plan, in the event such a plan is terminated prior to the expira-

tion of this lease, within 30 days of demand made thereafter, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing the lands included herein as the Secretary of the Interior may determine to be practicable and necessary or advisable, which plan shall adequately protect the rights of all parties in interest, including the United States.

*   *   *   *   *   *

"Sec. 4. Undivided fractional interest.—Where the interest of the United States in the oil and gas underlying any tract or tracts described in section 1 hereof is an undivided fractional interest, the following terms and conditions shall apply:

"(a) Rentals and royalties payable on account of each such tract shall be in the same proportion to the rentals and royalties provided for in the schedule attached to this lease as the undivided fractional interest of the United States in the oil and gas underlying such tract is to the full fee simple interest.

*   *   *   *   *   *

"Sec. 9. Heirs and successors in interest.—It is further covenanted and agreed that each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto."

The Unit owners' lease contained this provision:

"7. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, successors and assigns, but no change or divisions in ownership of the land, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding on Lessee until Lessee shall be furnished with a certified copy of recorded instrument evidencing same. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. * * *"

In its deed to the Lanes, the Government quitclaimed "all of the right, title, interest, claim and demand of the Government in and to all of the oil, gas and other minerals in, on, under, or that may be produced from" the land described, and all of its "rights, title and interest in, to, and under any leases, permits, contracts or other instruments to the extent that they cover said minerals and mineral interests hereby quitclaimed, * * *."

We have carefully considered the record in the light of the able briefs and oral argument of all parties, and, while the question is not free from difficulty, we are of the opinion that the court correctly held that the royalty under the Government lease is not apportioned.

It may be said that nonapportionment is the general rule, and it ordinarily controls when there are no stipulations to the contrary when the lessor sells a part of a tract covered by an oil and gas lease.

In Garza v. De Montalvo, 147 Tex. 525, 217 S.W.2d 988, 993, the Supreme Court said: " * * * where a portion of the leased premises is subsequently conveyed by the lessor, the royalties will not be apportioned on the basis of acreage in the absence of an express contract to that effect, but the owner of each separate tract will be entitled to receive royalties only on oil and gas produced from his tract. This is the settled law in Texas." In this opinion, the Supreme Court cited Japhet v. McRae, Tex.Com.App., 276 S.W. 669; Hinds v. McCord, Tex.Civ.App., 45 S.W.2d 442, and Mueller v. Sutherland, Tex.Civ.App., 179 S.W.2d 801. See also Nale v. Carroll, Tex.Civ.App., 266 S.W.2d 519; Thomas

Gilcrease Foundation v. Stanolind Oil & Gas Co., Tex., 266 S.W.2d 850.

■ "Whether or not a purchaser of part of the land is entitled to royalties and rentals arising from operations on other parts of the leasehold depends on the terms of the grant. It may give him a right to apportionment and vest in him an interest in the royalties and rentals accruing from production on any part of the leasehold. But when such a provision is not expressed in the deed the courts will not imply one, and in such case the grantee of a part of the land acquires no interest in the royalties and rentals from other parts. In other words, the purchaser of a portion of a leasehold is entitled to royalty upon production from his own tract alone and cannot share in the result of operations elsewhere on the leasehold." 31-A Tex.Jur., p. 494, sec. 270.

■ Nor are we able to agree with appellants' contention that the royalty interest purchased by appellees from the Government passed to West by virtue of the doctrine of after-acquired title.

It is true that the grantors in the lease of August 11, 1949, including appellees, owned only ¼ of the minerals at the time, and that they warranted the title "to said land." It is true that after-acquired title passes to the grantee by virtue of his warranty deed. But this is an equity doctrine, and grounded upon the principles of estoppel. The title after-acquired must be the title, or part of the title, which was purportedly conveyed by the deed to the grantee. Here the Unit owners were vested with ¼ of the minerals, and executed a lease on the entire tract. The lease, however, had a proportional royalty reduction clause which actually reserved to the lessors ¼ of the ⅛ royalty. At the time of the execution of the lease, the lessee held a lease from the Government on ¾ of the minerals in the same tracts. The Government lease also had a proportional royalty reduction clause. So it is seen that after the execution of the two leases, West had the full ⅞ working interest and the Government and the Unit owners had

altogether the ⅛ royalty interest. The Unit owners have not acquired any of the ¾ of the ⅞ working interest vested in West by the first or Government lease. Had it not been owned by the lessee but was truly outstanding, and had the lessors afterwards acquired that interest, we think it would have passed to the lessee under the after-acquired title rule.

It is not clear to us how the after-acquired title rule can be applied in favor of the lessee when the interest which was "outstanding" at the time of the execution of the lease has not been acquired by the lessors, but was at that time and still is owned by the lessee. Subsequently, the Government quitclaimed to the lessors the royalty reserved in its lease to West, together with its reverter rights. These royalty and reverter rights constituted no part of the estate the title to which was warranted by the Unit owners to West.

■ A title subsequently acquired inures to the purchaser upon the theory that the vendor is estopped to claim a title which he has assumed to convey. 43-A Tex.Jur., p. 315, sec. 263. But such estoppel is restricted to the estate intended to be conveyed by the grant, and is not applied to a reserved or excepted estate. Talley v. Howsley, 142 Tex. 81, 176 S.W. 2d 158. It does not apply to any interest after-acquired which was not purportedly granted. Clark v. Gauntt, 138 Tex. 558, 161 S.W.2d 270; Stoepler v. Silberberg, 220 Mo. 258, 119 S.W. 418. It cannot operate to vest in the grantee a greater estate than the deed itself would have conveyed. Chace v. Gregg, 88 Tex. 552, 32 S.W. 520. In MacDonald v. Sanders, Tex.Civ.App., 207 S.W.2d 155, it was held that the after-acquired title rule did not apply where the grantor in a mineral lease warranted title to a tract in which he owned only a ⅞ interest at the time but later acquired the outstanding ⅛ of the royalty.

It is our view that the Unit owners conveyed ¼ of the leasehold estate and warranted the title to all of the leasehold. They never acquired the balance of the leasehold estate, but their lessee owned it

at the time they gave their warranty, and still owns it. The lessors subsequently acquired the royalty interest which was reserved when their lessee acquired all of the leasehold estate which they never owned. They have never sold or purported to sell that royalty interest.

■ Appellants earnestly contend that leases such as those here involved convey all the minerals in a determinable fee, and that by virtue of the so-called royalty "reservations," royalties are not actually *reserved* by the lessors, but are made *payable* to the lessors upon their severance. They cite some authorities which apparently support that view. They therefore appear to argue that a warranty of title in such leases covers all the minerals, that which is commonly called "royalty" as well as that which is commonly called "working interest." If that be true, it seems there can be no distinction between leasehold estates and royalty estates in the lands here involved; and yet there is abundant authority for the proposition that a royalty interest, as well as a leasehold interest, is a fee simple estate in land. State Nat. Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757; Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Sheppard v. Stanolind Oil & Gas Co., Tex.Civ.App., 125 S.W.2d 643; State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 134 S.W.2d 1016, 128 A.L.R. 843; Garza v. De Montalvo, 147 Tex. 525, 217 S.W.2d 988.

■ If the Government reserved no mineral interest when it leased to West, it follows that the Unit owners acquired no mineral interest through the quitclaim deeds, and if they have acquired no title to minerals since they executed the lease to West, the after-acquired title rule cannot apply because there has been no title after acquired. But we think the royalty reservations were interests in land, separate and apart and with different characteristics from the leasehold estates. Surely royalty estates have substance. They are bought, held, mortgaged, sold, given away,

and taxed. Sheffield v. Hogg (Federal Royalty Co. v. State), 124 Tex. 290, 77 S.W.2d 1021. We conclude that the Unit owners did not warrant title to the royalty estate, and that their subsequent acquisition of a portion of it did not inure to the lessee.

■ In our opinion, appellants' proposition that the Unit owners may invoke the after-acquired title rule in relation to Lane's acquisition of the Government's ¾ royalty interest cannot be sustained. By his joinder in the lease on the 337.588 acres, Lane pooled the royalty estate which was created and limited by that lease; and the lease may be said to operate by legal implication as a conveyance of the royalty interest to his co-lessors. French v. George, Tex.Civ.App., 159 S.W.2d 566; Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43. But we do not think that Lane thereby conveyed the royalty estate which had theretofore been created and limited by the Government lease. These two royalty estates are not identical. They were created at different times; they may terminate at different times, and for different reasons; they are different estates in the same tract of land.

■ We fail to perceive error in the declination of the court to render a declaratory judgment to the effect that the intervenors might commingle oil from the several tracts in a common battery or batteries of tanks when it would be economical so to do. We do not find in the record any evidence of the existence of an actual controversy, or the ripening seeds of one, upon which appellants could seek this declaratory decree. Courts may not render advisory opinions upon controversies which parties apprehend will arise but which do not presently exist. 4 Tex.Jur. Ten-Year Supplement, p. 126, sec. 9; 16 Am.Jur., p. 292, sec. 18, and p. 293, sec. 19; Anderson, Declaratory Judgments (2nd Ed.), ch. 2, Justiciable Controversies, p. 38, et seq., sec. 9. The decree prayed for in this connection was not denied; the court only declined to declare on this phase of the case, "without prejudice to

the rights of any party in the future to seek and obtain relief as to such matters should the occasion properly arise."

Finding no error, the judgment is affirmed.